FILED

2011 Aug-16  PM 12:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| LESTER BROWN, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | CASE NO. 7:09-cv-2529-SLB |
| | } | |
| GREENE COUNTY COMMISSION, | } | |
| | } | |
| Defendant. | } | |
| | } | |

## MEMORANDUM OPINION

This case is currently before the court on defendant Greene County Commission's (the "Commission") Motion for Summary Judgment, (doc. 16).[1]  Plaintiff Lester Brown ("Brown") has sued the Commission for wrongful termination, alleging a "violation of his [F]irst [A]mendment rights." (Doc. 10 ¶¶ 18-20.)  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that the Commission's Motion for Summary Judgment, (doc. 16), is due to be denied.

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

# I. <u>SUMMARY JUDGMENT STANDARD</u>[2]

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

---

[2] The Commission's Memorandum Brief in Support of Its Motion for Summary Judgment, (doc. 17), contains a lengthy (and erroneous) recitation of the standard of review for a motion to dismiss, instead of the standard of review required for a motion for summary judgment. (*See id.* at 17.)

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("[I]t is never enough simply to state that the non-moving party cannot meet its burden at trial").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655(1962) (per curiam)). Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

3

## II.  FACTUAL AND PROCEDURAL HISTORY[3]

On May 25, 2000, Brown was employed by the Greene County Commission as the Assistant Solid Waste Officer.  (Doc. 18-1 at 2.)  On January 27, 2003, Brown was promoted to be the head of the Environmentalist Department, which is part of the Green County Public Works.  (Doc. 18-2 at 2; doc. 18-3 at 5.)  On May 7, 2007, the Greene County Personnel Appeals Board decided that Brown should be suspended for one month without pay and placed on probation for a period of twenty-four months because of numerous violations of the Personnel Policies and Procedures of Greene County, Alabama, including insubordination and abusive conduct; however, he was not demoted.  (Doc. 18-3 at 2-5.)

On July 7, 2008, the Greene County Commission held a meeting to consider whether to raise the solid waste disposal fee and sign a contract with an outside company to collect garbage in Greene County.  (Doc. 18-4, Recording of July 7, 2008, Commission meeting; doc. 18-5, Partial Transcript of Greene County Commission Meeting, at 2-5.)  Prior to the meeting (sometime in June 2008), Brown asked Commissioner Tennyson Smith ("Commissioner Smith"), to be placed on the agenda for the meeting for the specific

---

[3] Exhibit A to the Scheduling Order states that "[a]ll material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment." (Doc. 14-1 at 4 (emphasis removed).); *see also* Fed. R. Civ. P. 56(e)("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... (2) consider the fact undisputed for purposes of the motion . . . .").

purpose of raising his concern that an increase in the cost per household for waste management would have a hurtful impact on the community.  (Doc. 28-1 ¶¶ 4 & 11.) Commissioner Smith, who served as the Chairperson for Commission meetings, told Brown that the fee increase for solid waste disposal was not going to be discussed at the meeting.  (*Id.* ¶ 4.)  Nonetheless, Brown attended the meeting. (*Id.* ¶ 6.)  In doing so, Brown realized that the solid waste disposal fee had been discussed and that the Commission had already voted to increase the per household solid waste disposal fee. (*Id.*)

Although Brown was not on the agenda for the meeting, he waited until the time for public comments on the agenda to be recognized by Commissioner Smith to make his comments.  (*Id.* ¶ 7.)  After he was recognized by Commissioner Smith, Brown stood up and engaged in the following exchange with Commissioner Smith:

> Brown:   I beg to differ with the Commissioner in District Four and also with the engineer.  All these breakdowns that they are talking about up until now, when we started with the service for Greentrack, we had $39,000, and he's crying about $7000 for renting a truck, when I couldn't get a dump truck from him.  The stress and the pressure that you're putting on the senior citizens, we'd be fine if you'd implemented the $18. That's what release - Can't anyone come here and do it cheaper than the County Commission.  Now, he done spend umpteens of money – he got over 1000 hours in comp time—
>
> Smith:   Mr. Brown—ok—Mr. Brown—
>
> [Multiple persons continue to say "Mr. Brown "]
>
> Brown:   In comp time, that's 84 thousand that ain't even in that budget, that y'all going to have to pay.

Smith:      Mr. Brown—Mr. Brown

Brown:      Yes, Sir, Mr. Smith.  You said that I could get on the agenda
            Mr. Smith.  You lied to me, and that was wrong.

Smith:      No, no, have a seat

Brown:      I'm, I'm talking about you was wrong.  You a big liar.

Smith:      Mr. Brown, have a seat.  Have a seat.

Brown:      I don't have to have a seat

Smith:      Okay, then you may leave.

Brown:      You are so wrong.

Smith:      You may leave.

Brown:      I'm sorry man.

Smith:      Alright, you may leave.  Anybody else?

Brown:      Be strong, Commissioner in District 1.

            [inaudible yelling continues]

(Doc. 18-4; doc. 18-5 at 4-5.)

Following the meeting, on August 5, 2008, J.D. Smith, the County Engineer,

notified Brown that his conduct at the Commission meeting was considered to have

violated multiple provisions of the Personnel Policies and Procedures of Greene County,

Alabama, including abusive conduct, conduct unbecoming an employee, and

insubordination.  (Doc. 18-7 at 2-3.)  Brown was notified of his right to an informal

hearing and was suspended with pay until a determination was issued.  (*Id.*) After an

6

informal hearing was held, J.D. Smith notified Brown that his employment was terminated as of August 25, 2008.  (Doc. 18-8 at 2.)  Brown's termination was upheld by the Greene County Personnel Appeals Board.  (Doc. 18-9 at 2.)  An appeals hearing was scheduled before the Greene County Commission for October 14, 2008.  (Doc. 18-10 at 2.)  Brown refused to attend this hearing.  (Doc. 10 ¶ 13.)

On November 10, 2009, Brown filed this case in the Circuit Court of Greene County, alleging a violation of his rights under the First Amendment of the United States Constitution.  (*See* docs. 1 & 10.); *see also* U.S. Const., Amend. I.  The Commission removed the action on December 17, 2009.  (*See* doc. 1.)  Thereafter, the Commission filed a Motion for Summary Judgment, along with a Memorandum Brief in Support of Its Motion for Summary Judgment. (Docs. 16, 17, & 18-1 through 18-10.)  Brown filed a Response to Defendant's Motion for Summary Judgment. (Doc. 28.)  The Commission filed a Reply to Plaintiff's Response to Its Motion for Summary Judgment.  (Doc. 29.)  The court held oral argument on the Motion for Summary Judgment on June 21, 2011.

## III. <u>DISCUSSION</u>

"The First Amendment protects government employees from some, but not all, restraints on their right of free expression."  *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1563 (11th Cir. 1995) (citations omitted).  In the Eleventh Circuit, First Amendment retaliatory discharge claims are examined under the four part test announced in *Bryson v. City of Waycross*, 888 F.2d 1562 (11th Cir. 1989).  The *Bryson* test

7

examines: "(1) whether the employee's speech involves a matter of public concern, (2) whether the employee's interest in speaking outweighs the government's legitimate interest in efficient public service, [4] (3) whether the speech played a substantial part in the government's challenged employment decision, and (4) whether the government would have made the same employment decision in the absence of the protected conduct." *Beckwith*, 58 F.3d at 1563-64 (citing *Bryson,* 888 F.2d at 1565-66).

The first and second parts of the *Bryson* test "are questions of law with respect to which the court is required to examine for itself the statements at issue and the circumstances under which they are made to determine whether or not there is First Amendment protection." *Mitchell v. Hillsborough Cnty.*, 468 F.3d 1276, 1282-83 (11th Cir. 2006) (quoting *Morales v. Stierheim*, 848 F.2d 1145, 1148 (11th Cir. 1988)).  The third and fourth parts of the test are "questions of fact designed to determine whether a retaliatory motive was the legal cause of the challenged employment decision." *Beckwith*, 58 F.3d at 1564.  For the purposes of summary judgment, the Commission expressly concedes that absent Brown's comments at the Commission meeting on July 7, 2008, Brown would not have been terminated and the comments were the reason for his termination.  (*See* doc. 17 at 8.)  Therefore, the analysis herein is limited to the public concern question and the *Pickering* balancing analysis.

---

[4] This is the *Pickering* balancing test.  *See Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968).

## A. MATTER OF PUBLIC CONCERN

In addressing Brown's First Amendment retaliation claim, the court must first answer the "threshold question:" whether Brown's speech was made in his capacity as a citizen on a matter of public concern. *See Garcetti v. Ceballos*, 547 U.S. 410, 420-21 (2006). "When a public employee speaks not as a citizen, but as an employee, the First Amendment is not implicated." *Mitchell*, 468 F.3d at 1283 n.17 (citing *Morris v. Crow*, 117 F.3d 449, 457 (11th Cir. 1997)); *see Vila v. Padrón*, 484 F.3d 1334, 1339 (11th Cir. 2007) (acknowledging after *Garcetti* that, to analyze a First Amendment retaliation claim for speech by a government employee, "[t]he threshold question is whether [the government employee] spoke as a citizen on a matter of public concern"). The Eleventh Circuit has made clear that "[a]n employee's quotidian, work-a-day grievances are not constitutionally protected . . . ." *Mitchell*, 468 F.3d at 1283 n.17 (citing *Connick v. Myers*, 461 U.S. 138, 149 (1983)); *see also Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir. 1993) ("As an employee grievance, Morgan's speech was not a matter of public concern.").

The United States Supreme Court has defined public concern as "something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *City of San Diego v. Roe*, 543 U.S. 77, 84 (2004). In determining whether an employee's speech touched on a matter of public concern, the court must look to "the content, form, and context of a given statement, as revealed by the whole record." *Mitchell*, 468 F.3d at 1283 (quoting *Connick*, 461 U.S. at

147-48).  In doing so, courts are to ask:  "whether the 'main thrust' of the speech in question is essentially public in nature or private, whether the speech was communicated to the public at large or privately to an individual, and what the speaker's motivation in speaking was."  *Id.* at 1283-84 (internal citations and footnotes omitted).

The Commission makes two primary arguments to support its contention that Brown's speech did not touch on a matter of public concern.  First, the Commission contends that Brown's speech was not protected because it was the expression of a personal grievance against Commissioner Smith.  (Doc. 17 at 10-11.)  The Commission maintains that "it is clear from the recording that . . . [Brown's] real purpose in speaking was to let . . . Smith know that . . . [Brown] considered him to be a "big liar" and "so wrong."  (*Id.* at 11.)  Second, the Commission contends that "the portions of . . . [Brown's] speech that do not concern his anger with . . . Smith are incomprehensible to anybody that is not intimately connected with the workings of the Greene County Public Works Department" and that Brown is "specifically complaining about his working conditions, including the assignment of overtime." (*Id.*)  The Commission maintains that "[t]hese complaints . . . cannot be considered to be issues of public concern because they were clearly made in . . . [Brown's] capacity as an employee, not in his capacity as a citizen of Greene County."  (*Id.*)  The court does not agree with the Commission's interpretation of plaintiff's speech.

The court does agree with the Commission that the part of Brown's speech in which he called Commissioner Smith a "liar" and said that Commissioner Smith was "so wrong" was the expression of a personal grievance that was wholly devoid of a public interest element.  In context, Brown's speech was a private, personal grievance related to Smith telling Brown that he could not be on the agenda because the solid waste disposal fee issue would not be discussed.  However, while Brown's speech contained a personal grievance that, when considered in isolation, amounts to private, unprotected speech, that is not dispositive because Brown's speech also contained comments on the waste disposal rate increase issue.

"It is well understood that '[a]n employee's speech will rarely be entirely private or entirely public.'" *Akins v. Fulton County*, 420 F.3d 1293, 1304 (11th Cir. 2005)(quoting *Morgan,* 6 F.3d at 755).  In *Morris v. Crow*, the Eleventh Circuit "recognized that even speech that contains an 'embarrassing, vulgar, vituperative, ad hominem attack' can touch on a matter of public concern if there is a sufficient quantum of content touching on a matter of public concern mixed in with the attack." *Mitchell*, 468 F.3d at 1285 n.22 (quoting *Morris*, 117 F.3d at 456-58 (holding that speech that contained both personal attacks and comments on matters of public concern may still pass the threshold *Connick* test)).  Thus, if Brown's speech, as revealed by the whole record, contained a sufficient public interest element mixed in with the grievance, his speech will be afforded protection under the First Amendment.

11

Despite Brown's grievance against Commissioner Smith, the main thrust of Brown's speech was public, not private.  The remainder of Brown's speech related either directly or indirectly to the solid waste disposal fee issue.  The increase to the per household solid waste disposal fee was "a subject of general interest and of value and concern to the   . . . [people of Greene County]," *City of San Diego*,  543 at 84, and was thus a topic of public concern (that is not to say that Brown's speech on the waste disposal fee issue was necessarily designed to raise the issue as a matter of public concern, which is a related but different issue that is discussed below).  And importantly, contrary to the Commission's assertion, Brown's intention to discuss the waste disposal fee issue was **not** "so buried by his invective against . . . Smith that nobody listening to the speech could have reasonably divined that . . . [Brown] intended to discuss the waste disposal issue."  (Doc. 17 at 10-11.)

The partial transcript and the recording of the meeting show that, prior to Brown's remarks, the Commission discussed the waste disposal fee issue.  The discussion occurred, in large part, between Engineer J.D. Smith and Commissioner William Johnson ("Commissioner Johnson"), who represented District Four in Greene County.  (*See* docs. 18-4 & 18-5.)  In the discussion, J.D. Smith and Commissioner Johnson discussed various "breakdowns" to support and compare the new bid or proposal to Greene County's previous solid waste disposal practices, and J.D. Smith also specifically referenced a $7,500.00 bill for the rental of a garbage truck.  (*See* doc. 18-5 at 2-3.)  Further, in that

same discussion, Commissioner Johnson referenced the fact that two years before that

meeting the Commission had raised the per household solid waste disposal fee by $5.00,

bringing the fee up from $13.00 to $18.00 per month.  (*Id.* at 3.) Commissioner Johnson

noted that the $5.00 increase was never implemented.  (*Id.*)

    In context then, Brown's statement "beg[ging] to differ" with Commissioner

Johnson and J.D. Smith, referencing "$7000 for renting a truck," and commenting that

"we'd be fine if you'd implemented the $18.00" was a response to, and criticism of, the

merits of the discussion of the solid waste disposal fee issue that took place between J.D.

Smith and Commissioner Johnson earlier in the meeting.  *See Guster v. Hamilton County*

*Dept. of Educ.*, No. 1:02-CV-145, 2004 WL 1854181, *10 (E.D. Tenn. Mar. 2, 2004)

("Statements criticizing public policy and the implementation of it are protected by the

First Amendment.").  As Brown correctly points out, when he made the statement, "the

audience, who had previously heard the commissioner[s] essentially say the same thing,

. . . could gleam that . . . Brown was responding to comments previously made by the

commissioners on the issue of the rate increase."  (Doc. 28 at 9.)  Therefore,

notwithstanding Brown's grievance against Commissioner Smith, Brown's intent to speak

on the waste disposal rate increase issue was entirely discernable.[5]

---

    [5]The form of Brown's speech addressing the solid waste disposal fee issue was less
than eloquent.  However, "to hold that [Brown's] speech did not touch on a matter of public
concern simply because it was . . . [less than eloquent] would be to risk removing a large part
of modern political discourse from the shelter of First Amendment protections."  *Mitchell*,
468 F.3d at 1287; *see also Rankin v. McPherson*, 483 U.S. 378, 387 (1987) (quoting *New*

As to the Commission's argument that Brown was speaking on the waste disposal fee issue as an employee, not a citizen of Greene County, the court, drawing all reasonable inferences in favor of Brown, finds that Brown raised the issue in his capacity as a citizen.  At the very least, drawing all reasonable inferences in Brown's favor, as required on a motion for summary judgment, the court finds that there is a genuine issue of material fact as to whether Brown was speaking as a citizen or in his capacity as an employee.  The Eleventh Circuit has noted that "the mere fact that the topic of the employee's speech [is] one in which the public might or would have had a great interest is of little moment."  *Morgan*, 6 F.3d at 754.  The important inquiry is whether the speech was designed to address the issue as a matter of public concern or to further the speaker's own private interest.  *See id.*[6]  The evidence (and lack thereof) strongly supports the conclusion that Brown was speaking at the meeting on the waste disposal rate increase issue as a citizen.

---

*York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964) ("[D]ebate on public issues should be uninhibited, robust, and wide-open, and . . . may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.")).

[6] For instance, in *Morgan v. Ford*, the speech involved complaints of sexual harassment.  While the *Morgan* court recognized that sexual harassment was a "matter of important social interest," the court upheld the grant of summary judgment on the plaintiff's First Amendment claim because the plaintiff was speaking out of personal interest and not addressing the harassment as a "matter of public concern." *Id.* at 754-55.

14

First, the Commission has not presented *any* evidence of Brown's job descriptions or job duties as the head of the Environmentalist Department.  As a result, the court cannot conclude that Brown was speaking pursuant to his official duties as an employee, *see Garcetti*, 547 U.S. at 420-21 ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes."), or that his speech related to the subject matter of his employment, s*ee id.* (noting that whether the employee's speech concerned the subject matter of the employee's job is a factor in determining whether the employee spoke as a citizen or as an employee).

Second, the fact that Brown referenced information he acquired, and experiences he had, in the course of his employment when speaking on the waste disposal fee issue does not necessarily mean that he was speaking in his capacity as an employee.  In *City of San Diego*, the United States Supreme Court recognized that "public employees are uniquely qualified to comment" on "matters of public concern, [which are] typically matters concerning government policies that are of interest to the public at large . . . ." 543 U.S. at 80.  Brown, as a citizen of Greene County who is also employed by Greene County, is "uniquely qualified" to comment on the waste disposal fee issue, especially if he obtained his knowledge through the course of his employment. Although Brown referenced "Greentrack," "the budget," "comp-time," and "when I couldn't get a dump truck from him," which may relate to experiences or knowledge Brown may have

15

obtained through the course of his employment, Brown did so because, drawing all inferences in Brown's favor, those matters, in context, bore a rational and relevant relationship to the discussion of the waste disposal fee issue.

Third, Brown specifically made reference to the "stress and the pressure that you're putting on the senior citizens," and asked whether "anyone [could] come here and do it cheaper than the County Commission."  (Doc. 18-5 at 4.)  Brown's expression of concern for the senior citizens of Greene County, and his stated belief that the Commission may not have been getting the best deal for the citizens, support the conclusion that Brown's speech addressed the waste disposal fee issue as a matter of public concern.  The Commission contends that Brown "has relied on his single comment regarding senior citizens as evidence that, to the extent that he was concerned with more than merely expressing a personal grievance against the Commission and . . . [Commissioner] Smith, his speech was made [in] his capacity as a citizen of Greene County, not in his capacity as an employee."  (Doc. 29 at 3.)  The Commission maintains that "a single comment expressing concern as to how an employee's working conditions will affect his or her clients does not elevate a complaint about those conditions to protected speech." (*Id.* at 3-4.)  The Commission's argument is without merit.  Brown has not relied on a single comment; instead, he has relied on the whole record, which includes several comments that were made in addition to his statement about senior citizens.

16

Fourth, the Commission has not disputed the fact that Brown's motivation for attending the meeting was to voice his concerns with, and raise his objections to, an increase to the per household solid waste disposal fee.  *See Morris*, 117 F.3d at 457 ("[A]n employee's motive for speech . . . is a factor that must be considered in determining whether speech is a matter of public concern.").  Brown's undisputed motivation is consistent with the remarks he made at the meeting and supports the conclusion that Brown was speaking as a citizen on a matter of public concern.  This case is unlike other cases where the employer has succesfully shown that the employee was motivated to speak in part by a personal motivation or intent unrelated to the public concern in question.  For instance, in *Mitchell*, the employee "testified that his intent was both to ridicule . . . [the County Commissioner] personally and to use that personal ridicule - through its purportedly humorous [and satirical] nature - to make a point about her position . . ." on the public concern in question.  468 F.3d at 1285 n.23.  The *Mitchell* court characterized the employee's "satirical motivation argument" as "a post-hoc rationalization" and "[d]ubious, after-the-fact, subjective justification."  *Id.* at 1287.  And in *Morris*, there was "no dispute that . . . [the employee's] dissatisfaction with . . . [the sheriff's] decision to fire her husband played a substantial role in her sign-waving at the polling place," such sign-waiving being the expression of speech that formed the basis of her First Amendment claim. 117 F.3d at 457.  Here, the court sees no reason to "doubt . . . [Brown's] motivation argument."  *Mitchell*, 468 F.3d at 1268.  The Commission has not

17

proffered **any** evidence (other than the speech itself) to support its contention that Brown's "real purpose" in speaking was to attack Commissioner Smith and the Commission.

Fifth, Brown made his comments at a public meeting during the time for public comments at that meeting.  In *Mitchell*, the Eleventh Circuit discussed public comment periods in the context of a First Amendment retaliation claim.  The court stated: "Such a public comment period designated for citizens to exchange political ideas - though somewhat more limited than the archetypical public fora of streets and parks, **implicates core first amendment concerns**." *Mitchell*, 468 F.3d at 1286 n.25 (emphasis added). The Commission has not presented any evidence to show that Brown sought to be on the agenda or requested recognition during the public comment period in his capacity as an employee.  Rather, all the evidence (and lack thereof) discussed above, when considered against the backdrop of Brown's speech as a whole, supports the reasonable inference and conclusion that Brown attended the meeting in his capacity as a private citizen and spoke in that capacity on a matter of public concern.

The Commission relies heavily on the Eleventh Circuit's decision in *Mitchell v. Hillsborough County*, 468 F.3d 1276 (11th Cir. 2006). (*See* doc. 29 at 3.)  *Mitchell* concerned Hillsborough County's decision to terminate Gary Mitchell, who was employed as a cameraman for the County Communications Department's television station, Hillsborough Television.  Mitchell was also a volunteer producer for Speak Up

18

Tampa Bay Public Access Television ("Speak Up"), a nonprofit public-access television corporation that received funding from Hillsborough County.  During the course of Mitchell's employment, a dispute arose between Speak Up and Hillsborough County regarding whether Speak Up breached its contract with the County when it aired "The Happy Show," which portrayed a man reading a children's book, while interrupted intermittently by scenes of nudity, without first airing a mature-audience warning. While the County had no control over the programming on Speak Up, Commissioner Rhonda Storms sought to discontinue funding to Speak Up based upon the alleged breach of contract.  *Id.* at 1278-79.

After the funding issue for Speak Up became a public controversy, the Board of County Commissioners held a meeting and set aside a public comment period for public discussion of the funding issue.   Mitchell attended the Board of County Commissioners meeting on his own behalf, and not as a representative for the County.  *Id.* at 1279. During the public comment period, Mitchell, who was the first to speak, stood at the podium and made the following comments:

> Gary Mitchell, 808 East Chelsea. And I am here representing the Thunderheads, you see? [indicating a lightning bolt taped to his beret] The Thunderheads is a political support group, and we are looking for more people to support, such as yourselves; therefore, I've come to address you all, letting you know our services are available to you. Right at the moment we are in full complete support of Ms. Storms. She is wonderful in every way. We have the highest regard for her. We think she is correct in all of her thinking. I think there's a lot of people here that agree with me on that. Yes.

[APPLAUSE]

The only problem we have, Ms. Storms, is that our meetings since you
brought up this preoccupation you have with other women's vaginas, we
are-the meetings are degenerating into one side wanting to call you Vagi,
and the other side are [sic] saying Gina, Gina [pronounced ji-nah]. My
position is Gina, I think that's probably much more appropriate, okay? But I
would like some time for you to make this clear to us which you would
prefer to be called, Vagi or Gina, okay? Now, we're liable-we're happy to
work with all of you for the rest of this. We love you. We love you. Do you
mind if I call you Vagi or would you prefer me call you Gina? I prefer Gina.
Anyway, we are the Thunderheads, and the reason we're called
Thunderheads is because storm clouds, you know, Thunderheads, storm
clouds, yes. And we even-we even have our own special thunder wave, and
we saved this for our best loving people. Now, we go [Mitchell stuck out
his tongue and wiggled it]-like that, and that's only a sign of great respect
and love. Now, of course, we have the thunder spring showers, which is the
highest form, which is [Mitchell performed a raspberry]-okay. Fine. We
wonder where the wave came from . . . .

*Id.* at 1279 -1280.

Mitchell's supervisor was watching the meeting on television from his office and

heard the comments as Mitchell made them.  He construed Mitchell's speech to be a

personal attack on Commissioner Storms and decided to immediately dismiss Mitchell.

*Id.* at 1280-81.  Following his termination, Mitchell filed suit against the County alleging

that he was fired for engaging in protected speech under the First Amendment.  *Id.* at

1281.  The district court determined, among other things, that Mitchell's speech was not

protected under the First Amendment because it did not touch on a matter of pubic

concern.  Mitchell appealed.  *Id.* at 1281-82.

20

On appeal, Mitchell did not argue that, on its face, his speech touched on a matter of public concern.  Instead, Mitchell argued that his intent was both to attack Storms personally and to satirize Storm's position in the Speak Up funding controversy.  *Id.* at 1284-85.  The Eleventh Circuit rejected Mitchell's argument and affirmed the decision of the district court.  *Id.* at 1287.  The Eleventh Circuit "agree[d] with the district court that, when viewed in isolation, there is nothing in the content of Mitchell's statements that can be said to touch on a matter of public concern."  *Id.* at 1285.  As to Mitchell's argument that his speech, in context, satirized the controversy, the court held that "[w]hatever Mitchell's intentions may have been in delivering his speech, the decisions he made in the form and language used to express his ideas sufficiently obscured those intentions from his audience . . . ."  *Id.* at 1287.

The court need not labor long to distinguish *Mitchell* from this case. Unlike the speech in *Mitchell*, Brown's speech, on its face, contains substantial content touching on a matter of public concern.  *See id.* at 1284 ("Content is undoubtedly the most important factor in assessing whether particular speech touches on a matter of public concern.").  Brown's response to the previous discussion of the waste disposal fee issue, his reference to the stress and pressure on senior citizens, and his question about the Commission's ability to obtain cheaper solid waste disposal services for the citizens of Greene County constitute a "sufficient quantum of content touching on a matter of public concern mixed in with the attack" to afford protection under the First Amendment.  *Id.* at 1285 n. 22.

21

Therefore, to the extent the Commission seeks summary judgment on the ground that

Brown did not engage in protected speech, the Commission's Motion for Summary

Judgment, (doc. 16), is due to be denied.

## B. *PICKERING* BALANCING TEST

Since Brown engaged in protected speech under the First Amendment, the court

must determine, as a matter of law, whether the Commission's interest as an employer

outweighs any interest that Brown may have had in his speech.  In *Pickering,* the United

States Supreme Court stated:

> [T]he state has interests as an employer in regulating the speech of its
> employees that differ significantly from those it possesses in connection
> with regulation of the speech of the citizenry in general.  The problem in
> any case is to arrive at a balance between the interests of the [employee] as
> a citizen, in commenting upon matters of public concern and the interest of
> the state, as an employer, in promoting the efficiency of the public services
> it performs through its employees.

*Pickering,* 391 U.S. at 568.

Under the *Pickering* balancing test, several factors must be considered in

determining whether a defendant's interest in promoting efficient government services

outweighs a plaintiff's interest in protected freedom of speech: "(1) whether the speech at

issue impedes the government's ability to perform its duties efficiently, (2) the manner,

time, and place of the speech; and (3) the context within which the speech was made."

*Martinez v. City of Opa-Locka,* 971 F.2d 708, 712 (11th Cir. 1992)(quoting *Bryson*, 888

F.2d at 1567)(emphasis omitted).  Further, in determining whether plaintiff's speech

22

impeded the County's ability to perform its duties efficiently, the Supreme Court in *Rankin* instructed the court's to examine "whether the statement impairs discipline by superiors or harmony among co-workers, or has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary." *Bryson,* 888 F.2d at 1567 (citing *Rankin,* 483 U.S. at 388). Generally, where "close working relationships are essential in fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate." *Goffer v. Marbury,* 956 F.2d 1045, 1049 (11th Cir. 1992).

The Commission relies on *Jones v. Heyman*, 888 F.2d 1328, 1332 (11th Cir. 1989), where the Eleventh Circuit noted that the United States Supreme Court has "recognized the significance of the government's interest in conducting orderly, efficient meetings of public bodies." *Id.* at 1332 (citing *City of Madison, Joint School Dist. v. Wisconsin Employment Relations Comm'n,* 429 U.S. 167 (1976)). In *Jones*, the plaintiff, Jones, attended a meeting of the Key West City Commission. As the mayor of the city, the defendant, Heyman, presided at the meeting. Although Jones was a member of the city's civil service board, the court found that he attended the meeting in his capacity as a private citizen. After Heyman recognized Jones to speak on an item on the agenda, Jones approached the podium and began to criticize the commission's general spending habits and insult Heyman, rather than addressing the agenda item for which he had be recognized to speak. Heyman quickly rebuked Jones, advising him to confine his

comments to the topic at hand.  Jones refused and continued to insult Heyman.  Heyman
warned Jones that any further outbursts would result in his removal from the meeting.
Jones failed to heed the warning, and continued to criticize Heyman before being forcibly
removed from the meeting.  *Id.* at 1329.

Jones thereafter filed suit against Heyman and the City of Key West for a violation
of 42 U.S.C. § 1983, alleging that his removal from the meeting constituted a deprivation
of his rights under the First and Fourteenth Amendments.  *Id.* at 1330.  The district court
found that the city commission designated their meeting as a public forum when the
commission opened it to the public and permitted public discourse on agenda items.
Recognizing that time, place, and manner restrictions on speech in a public forum are
invalid unless they are content-neutral, narrowly drawn to achieve a significant
governmental interest, and allow communication through other channels, the district court
held that Heyman had silenced Jones based on the content of his comments and thus
deprived him of his right to free speech.  *Id.*  Heyman appealed.  On appeal, the Eleventh
Circuit reversed the decision of the district court, holding that Heyman, pursuant to his
interest in "controlling the agenda and preventing the disruption of the commission
meeting," acted "reasonably in regulating the time, place, and manner of Jones' speech."
*Id.* at 1333-34.

Although *Jones* bears factual resemblance to this case, *Jones* is legally
distinguishable because it did not involve the application of the *Pickering* balancing test.

24

The issue in *Jones* was whether the restriction on Jones's speech was a valid time, place, and manner restriction on speech in a public forum, which is related to, but different than, the issue presented in this case.  *See id.* at 1332-34.  Rather than focus on the factual similarities between this case and *Jones*, the court will engage in the balancing test without reference to the analysis in *Jones*.

As to the balancing test, Brown contends that the Commission "offers no evidence to demonstrate either of the test factors indicated in *Rankin*."  (Doc. 28 at 12.)  Brown maintains that there "is absolutely no evidence presented by the . . . [Commission] that . . . [Brown's] comments during the meeting impaired discipline by superiors or harmony towards co-workers" or that Brown's "comments impeded the speaker's duties or interfered with the regular operation of the enterprise."  (*Id.* at 14.)  In response, the Commission acknowledges the lack of evidence, but contends that the Commission cannot be "faulted" for the lack of evidence because "the United States Supreme Court has held that a public employer such as the County Commission is under no obligation to 'allow the events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action.'"  (Doc. 29 at 5 [citing *Connick*, 461 U.S. at 152].)  The Commission maintains that "a court is not to second guess a public employer's determination of issues like workplace harmony and the effect that insubordination may have on the employer's operations but instead is to grant the decisions 'a wide degree of deference.'"  (*Id.* [citing *Connick*, 461 U.S. at 152.].)

25

While it is true that "[t]he Supreme Court in *Connick* reasoned that public employers do not have to wait for actual disruption or internal damage to take place, stating that 'we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action[,]  *Mitchell*, 468 F.3d at 1288 n.31 (citing *Connick*, 461 U.S. at 152), the Supreme Court immediately thereafter "caution[ed] that a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern."  *Connick, 461* U.S. at 152; *see also Eiland v. City of Montgomery*, 797 F.2d 953, 958 (11th Cir. 1986)("Although an employer need not allow events to deteriorate to the point of actual disruption before taking action, the Court in *Connick* cautioned 'a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern.'")(citation omitted); *McMullen v. Carson*, 939 (11th Cir. 1985) ("*Connick* cautioned that 'a stronger showing may be necessary if the employee's speech more substantially involved matters of public concern.'")(citation omitted).  Because the court has determined that Brown's speech regarding, and in response to, the Commission's discussion and decision with respect to the solid waste disposal fee issue substantially involved a matter of public concern, the court concludes that "a higher showing of potential disruption was required than was shown here in order to conclude that . . . [the Commission's] interests outweighed . . . [Brown's] interests in his constitutionally protected speech."  *Eiland*, 797 F.2d at 958-59.

26

The Commission has presented no evidence that Brown's speech caused an actual disruption or even had the potential to cause a disruption of the County's ability to maintain an efficient workplace.  Therefore, a holding that the County's interest, as an employer, in promoting the efficiency of the public services it performs outweighs Brown's speech would be "based upon assumption and speculation . . . ."  *Eiland v. City of Montgomery,* 797 F.2d 953, 959 (11th Cir. 1986).  The Commission contends that the conclusion that its interest outweighs Brown's interest is "mandated by . . . the disruption that he caused at the . . . meeting . . . [and] the disruption to the Commission's activities that would have occurred had . . . [Brown] been allowed to continue his employment after his behavior."  (Doc. 17 at 12.)  The Commission, however, has not explained how or if his speech actually disrupted, or had the potential to disrupt, Greene County's functions. *See Barker v. City of Del City*, 215 F.3d 1134, 1140 (10th Cir. 2000) (reversing summary judgment where the city never "articulated how . . . [the public employee's] speech actually, or even potentially, disrupted its government function"); *Kincade v. City of Blue Springs*, 64 F.3d 389, 398-99 (8th Cir. 1995)(finding mere assertion that contested speech "caused the City problems" and "adversely affected the efficiency of [the] City's operations and substantially disrupted the work environment," with no supporting evidence, insufficient to trigger *Pickering*).  Nor has the Commission explained how the "ramifications" of Brown's speech "would . . . certainly be very negative."  (Doc. 17 at 15.); *see Lindsey v. City of Orrick*, 491 F.3d 892, 901 (8th Cir. 2007) (affirming district

27

court's denial of motion for summary judgment where employer called employee's speech "confrontational and disruptive," but failed to "explain how or if his speech actually disrupted the city's functions").  The Commission's "vague and conclusory statements do not demonstrate with any specificity that the speech created disharmony in the workplace, impeded . . . [Brown's] ability to perform . . . [his] duties, or impaired working relationships with other employees."  *Sexton v. Martin*, 210 F.3d 905, 912-13 (8th Cir. 2000).

It would *appear* that Brown, as the head of the Environmentalist Department, was in a position that would require him to implement policies and procedures promulgated by the Commission, thus placing him in a position where a close working relationship with the Commission could be essential in fulfilling public responsibilities.  However, the court, drawing all reasonable inferences in Brown's favor, cannot reach such a conclusion because the Commission has not presented any evidence of Brown's relationship to the Commission or the internal structure of Greene County as a government entity.  The Commission may be able to prove, through evidence from persons such as J.D. Smith and Commissioner Smith, that Brown's speech had a detrimental impact on close working relationships for which personal loyalty and confidence are necessary.  However, at this stage in the proceedings, the Commission has not done so.  The court cannot even determine whether Brown was being insubordinate because the Commission has not

directed the court to any evidence showing that Commissioner Smith or J.D. Smith are Brown's superiors.  The identity of Brown's superiors is not revealed by the evidence.

Moreover, the evidence that has been presented to the court supports the conclusion that Brown's speech did not disrupt the Commission's ability to run orderly, efficient meetings or provide public services.  Brown's speech at the meeting occurred outside the workplace.  Brown's speech at the meeting lasted less than two minutes.  His comments were made during the time for public comments.  Although Brown refused to sit down and come to order, Brown immediately thereafter left the meeting and did not return.  Following Brown's departure from the meeting, the meeting proceeded as if Brown had not spoken at all.  Although the Commission indicated in its letter to Brown that Brown brought "discredit upon the County" by making the speech in a public meeting where the public was in attendance, this allegation, like the Commission's other allegations under *Pickering*, is unsupported by any evidence.  *See Sexton*, 210 F.3d at 912 (holding that testimony provided by the city, which indicated that the employee's speech had adversely affected employee morale and had damaged the "Department's reputation and created significant political problems[,]" was unsupported and therefore insufficient to trigger *Pickering*).

The court is mindful that "[f]or purposes of determining whether speech 'impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or

29

impedes performance of the speaker's duties, or interferes with the regular operation of the [public employer's] enterprise,' the perceived character of the speech is more relevant than the subjective intentions that accompany its delivery." *Morris*, 117 F.3d at 458 (internal citation omitted).  In *Mitchell*, the Eleventh Circuit, relying on *Morris*, explained:

> The First Amendment does not require a public employer to tolerate an embarrassing, vulgar, vituperative, ad hominem attack, even if such an attack touches on a matter of public concern. If the manner and content of an employee's speech is disrespectful, demeaning, rude, and insulting, and is perceived that way in the workplace, the government employer is within its discretion to take disciplinary action.

*Mitchell*, 468 F.3d at 1288 (quoting *Morris*, 117 F.3d at 458)(quotations omitted).

Although there is a letter from J.D. Smith to Brown in the record indicating that he perceived Brown's speech as "abusive," "disrespect[ful]," "insolent,"and "unbecoming an employee," (doc. 18-7 at 1), a single statement from a supervisor or co-worker communicating his perception of the employee's speech to the employee is insufficient to tip the *Pickering* scales in the employer's favor.   The court does not read *Mitchell* and *Morris* as creating "a steadfast rule against which the first amendment rights of all public employees may be judged," *Eiland v. City of Montgomery,* 797 F.2d at 955 n.2, and declines to interpret the Eleventh Circuit's statement in *Mitchell* and *Morris* in a vacuum without reference to how the employer's perception of the employee's speech relates to an actual or potential disruption or the government's ability to fulfill its functions and provide services in an orderly, efficient manner.  If the manner of the speech, its content,

and the employee's perception were the only relevant factors, the balancing required

under *Pickering* would be meaningless.  Obviously, and as shown by a careful reading of

*Mitchell* and *Morris*, it is not.

In both *Mitchell* and *Morris*, the Eleventh Circuit analyzed the perceived character

of the speech as it related to the actual or potential disruption and impairment of the

employer's institutional efficiency.  For instance, in *Mitchell*, there was overwhelming

evidence showing that the employee's speech was perceived as not only disrespectful,

demeaning, rude, and insulting, but also as potentially causing a significant disruption in

Hillsborough County's ability to regulate Hillsborough Television and provide

Hillsborough Television's services efficiently.  *See Mitchell*, 468 F.3d at 1288-89.  The

court discussed the evidence in detail:

> Although a part-time employee, Mitchell frequently acted as a cameraman
> for BOCC meetings. After his speech at the April 17 meeting, Mitchell's
> supervisors lost confidence that he could continue to work for HTV without
> significant disruption, particularly after Storms requested that no Public
> Access employees be at the studio to work BOCC meetings after Mitchell's
> comments. Foerster was concerned that Mitchell's relationship with BOCC
> members was irreparably strained, and therefore the efficiency of HTV
> would be impaired by the change in Mitchell's work assignments. This was
> true even though Mitchell would not be coming in direct contact with
> BOCC members, because he had important responsibilities in HTV
> production.
> . . .
> Both Foerster and Vawter testified that not only did they not understand the
> nature of Mitchell's attempted parody, they were extremely concerned
> about the effect of Mitchell's vulgar tirade on HTV's relationship with the
> County. HTV is charged with filming many different BOCC-related
> meetings and activities, and Mitchell's continued employment after his
> offensive remarks could potentially destroy the confidence BOCC and the

31

County Administrator had in HTV. Given Mitchell's responsibilities with regard to filming BOCC meetings, we see no reason to dispute these concerns that led to the County's decision to terminate Mitchell. Mitchell provided no evidence at trial to demonstrate that the County's fears were unreasonable.

*Id.* (footnotes omitted).

In *Morris*, the plaintiff, a deputy sheriff, filed suit alleging that she was transferred from patrol duty to the corrections department in response to her exercise of her First Amendment right to endorse the former sheriff, Sherriff Mims, instead of the current sherriff, Sherriff Crow, in an upcoming election.  On the day of the election, the plaintiff informed her supervisor that she was going to visit her husband at a polling place during her lunch break.  Several of the plaintiff's co-workers had taken the day off to campaign for Sheriff Crow and those co-workers were present at the same polling place as the plaintiff's husband when the plaintiff arrived.  *See Morris*, 117 F.3d at 451-53.  When the plaintiff arrived at the polling place, the following events unfolded:

> . . . she immediately noticed that her husband was not holding his Mims sign and waving at passersby. Instead, he was chatting with some of his former coworkers from the Sheriff's Department. This did not sit well with Morris. According to the trial testimony, Morris "jumped" out of the car and screamed at her husband to "Get his ass out next to the street and hold the sign properly and wave and smile." Apparently, Morris thought her husband needed a sign-waving lesson, because she then picked up the sign and yelled, "I'll show you the fucking way how to hold this motherfucking sign to campaign." Morris then began to wave at passersby, while holding the sign. After the demonstration, Morris' husband took the sign back. During this demonstration, Captain Mac Hall (one of Morris' supervisors) was standing and watching nearby. According to Captain Hall, Morris then "turned to me and pointed her finger at me, and told me that she was on her fucking lunch hour and she had a right to vote and this is the way she was

32

doing it," and "[t]hen she proceeded to still yell and scream and told me that
if Sheriff Crow had not fired her husband, that he would be holding a
fucking Crow sign also."

*Id.* at 452.

All the witnesses to the incident, other than the plaintiff, including the plaintiff's
co-workers, testified that the plaintiff "had addressed Captain Hall in a disrespectful,
shocking, hostile, embarrassing, and insubordinate manner." *Id.* The plaintiff's co-
worker, Lieutenant William Isbell, testified that the plaintiff's conduct was "[n]ot only
disrespectful to Hall, [but] disrespectful to the sergeant and myself and everyone who was
there that was associated with the sheriff's office. Everyone, I believe, was embarrassed."
*Id.* at 453. Another co-worker, Lieutenant Anna Kestner, testified that the plaintiff's
speech "made me feel very embarrassed. And we left very shortly after that because of the
situation, because it was so embarrassing . . . ." *Id.* at 454. Yet another co-worker,
Deputy Sherriff Deborah Osborn, described the speech as follows: "She said fuck. She
said shit. She was very loud. She was very sarcastic and she was-she used totally
inappropriate language to a supervisor as far as I'm concerned." *Id.* When asked whether
it appeared that the plaintiff was showing any respect to her superior, Lieutenant Osborn
stated: "Not at all. Not only to the captain, but there was a lieutenant and a sergeant there
also, and to me that was totally inappropriate to a supervisor." *Id.* Lieutenant Osborn
also stated that employees of the sheriff's office were "all very shocked and
embarrassed." *Id.* Finally, Lori Lockwood, a secretary in the Sheriff's Department, gave

33

similar testimony.  She stated that she was "shocked that someone would speak to a supervisor that way.  And just embarrassed because there were so many other people around."  *Id.*

Unlike *Mitchell* and *Morris*, "[t]his is not a case where the weight of the evidence foretells an imminent conflict as a result of the employee's speech."  *Belyeu v. Coosa County Board of Education*, 998 F.2d 925 (11th Cir. 1993)(citation omitted).  The Commission essentially requests that the court infer or presume the negative ramifications of Brown's speech, if there were any, from the speech itself and without any other evidence or explanation.  Such a request, however, is not consistent with Eleventh Circuit precedent.  *See Fikes v. City of Daphne,* 79 F.3d 1079, 1084 (11th Cir. 1996)(overturning the district court's dismissal of plaintiff's First Amendment claim because there was "no indication that . . . [plaintiff's] actions disrupted the functioning of the Daphne police department").

Several cases from the Eleventh Circuit (and elsewhere), aside from *Mitchell* and *Morris*, support the conclusion that some evidence or indication relating to impairment or disruption is generally necessary to prevail under *Pickering*, especially in cases where the employee's speech substantially touches on a matter of public concern.  In *Belyeu v. Coosa County Board of Education*, the plaintiff was a teacher's aide who expressed her opinion at a meeting of the PTA about a perceived lack of support by the School System for Black History Month.  *See* 998 F.2d at 926.  After the meeting, Beyleu's supervisor

told her that he was disappointed that she had raised this issue in a public forum and that

he would prefer that she discussed such matters privately with him.  *Id.*  Belyeu's contract

was not renewed for the following year, and she claimed that such action was taken to

punish her for her protected speech.  *Id.* at 927.

At trial, the court applied the *Pickering* balancing test and held in the School

System's favor.  *Id.* at 929.  The plaintiff appealed.  On appeal, the Eleventh Circuit

reversed and remanded, holding that the district court "erred in determining that the

School System's interest . . . outweighs Beyleu's interest in free speech."  *Id.* at 931.  In

doing so, the court stated:

> After balancing the School System's interest in quelling public discussion
> of racially divisive issues against Belyeu's interest in free speech, we
> conclude that, under *Pickering,* the latter is more compelling. Belyeu's
> remarks did not disrupt the School System's function by enhancing racial
> division, nor, based on the nature or context of her remarks, was her speech
> likely to do so. We have upheld the right of public employees to discuss the
> alleged racial discrimination of their employer under circumstances more
> likely to result in the disruption of public services. For example, in *Leonard,*
> black police officers participated in a public demonstration, picketing the
> department and removing the American flags from their uniforms in protest
> of the police brutality to members of the black community as well as
> discrimination within the department against black officers. This is not a
> case where the weight of the evidence foretells an imminent conflict as a
> result of the employee's speech. This is also not a case where the employee
> occupies a sensitive position representing the employer in its dealings with
> the community. Belyeu served no confidential, policy-making or public
> contact role. In sum, ***the evidence fails to show that Belyeu's speech was a***
> ***significant threat to any interest of the School System***.

*Belyeu*, 998 F.2d at 929-30 (citations and footnotes omitted)(emphasis added).[7]

The Eleventh Circuit's decision in *Tindal v. Montgomery County Commission,* 32 F.3d 1535 (11th Cir. 1994), *reh'g and reh'g en banc denied,* 42 F.3d 646, provides further support for the court's position.  There, the plaintiff brought an action claiming that she had been terminated by the sheriff's department after testifying in a suit charging the local sheriff with sex and race discrimination.  The former and current sheriffs filed motions for summary judgment, claiming that they were entitled to qualified immunity.  The district court denied the request for immunity and the defendants appealed.  As relevant here, the Eleventh Circuit affirmed the district court's ruling that the former sheriff was not entitled to qualified immunity from the First Amendment retaliatory discharge claim.  *Tindal*, 32 F.3d at 1537-38.  In applying *Pickering*, the Eleventh Circuit stated:

> The second part of the *Bryson* test, as applied in this case, asks whether Tindal's interest in her speech in the district court outweighed the state's interest in promoting efficient public service. *Bryson,* 888 F.2d at 1565 (quoting *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968)). Courts have recognized that some

---

[7] The *Belyeu* court cited with approval cases from the Fourth, Tenth, and Eleventh Circuits, which all held that *Pickering* balance favored the employee's freedom of speech where employer's claims of disruption were unsupported.  *See id.* at 929 n.5 (citing *Luethje v. Peavine School Dist.,* 872 F.2d 352, 355 (10th Cir. 1989)(*Pickering* balance favored school employee where, although the employee's complaints created a community controversy, there was no evidence that her speech impaired discipline or the effective operation of the school); *Piver v. Pender County Bd. of Educ.,* 835 F.2d 1076, 1081 (4th Cir. 1987)(assertion that speech by teacher at public meeting might result in turmoil insufficient to justify termination under *Pickering), cert. denied,* 487 U.S. 1206 (1988); *Eiland,* 797 F.2d at 959 (unsupported speculation that derogatory poem posted by police officer may have disrupted discipline does not outweigh employee's right to speech), *cert. denied,* 483 U.S. 1020 (1987)).

speech, even though about a matter of public concern, may unreasonably disrupt the efficient conduct of government operations; in order to promote efficient public service, therefore, government employers may take action against employees who engage in such disruptive speech. Specifically, Tindal would merit no First Amendment protection if her speech "so severely impeded [her] own effectiveness and the effectiveness of [the Sheriff] that the governmental interest at stake in this case [e.g., efficient operation of the Sheriff's office] clearly outweigh[ed Tindal's] speech interest." *Morales v. Stierheim,* 848 F.2d 1145, 1151 (11th Cir.1988), *cert. denied*, 489 U.S. 1013, 109 S.Ct. 1124, 103 L.Ed.2d 187 (1989). As observed above, Tindal clearly had an interest in her speech describing the discrimination present in the Sheriff's office. ***The state interest half of the balance, however, is empty: Butler has proffered no evidence indicating that Tindal's speech inhibited either her work or the work of the office***. Tindal satisfies this part of the *Bryson* test.

*Id.* at 1540 (emphasis added).

As in *Tindal* and *Belyeu*, "[t]he . . . [County] interest half of the balance . . . is empty . . . ." *Id.* Brown's speech is "neither shown nor can be presumed to have in any way impeded . . . [Brown's] proper performance of his daily duties . . . or to have interfered with the regular operation of . . . [Greene County] generally." *Pickering*, 391 U.S. at 572-73. Therefore, viewing the facts in a light most favorable to Brown and drawing all reasonable inferences in his favor, the court finds that Brown's interest in his speech outweighs the Commission's interest as an employer.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that the Commission's Motion for Summary Judgment, (doc. 16), is due to be denied. An Order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE**, this 16th day of August, 2011.

_Sharon Lovelace Blackburn_
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE